**Randall David FISCHER, Plaintiff,**

v.

**MT. OLIVE LUTHERAN CHURCH, INC., Ray Connor, Sandra K. Janiszewski, and Rose C. Salzmann, individually, Defendants.**

No. 01–C–0158–C.

United States District Court,
W.D. Wisconsin.

March 28, 2002.

**916**

William J. Egan, Minneapolis, MN, for plaintiffs.

Richard M. Burnham, La Follette, Godfrey & Kahn, S.C., Madison, WI, for defendants.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for monetary relief in which plaintiff Randall David Fischer contends that defendants violated various privacy-related statutory and common laws in the course of terminating plaintiff's employment, including the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510–21; Wisconsin Communications Privacy Act, Wis. Stat. § 968.31; Electronic Communications Storage Act, 18 U.S.C. §§ 2701–11; Computer Fraud and Abuse Act, 18 U.S.C. § 1030; right to privacy (intrusion upon privacy of another and public disclosure of public facts), Wis. Stat. § 895.50; defamation; trespass; breach of contract; tortious interference with a contract; intentional infliction of emotional distress and false imprisonment. Jurisdiction is present under 28 U.S.C. §§ 1331 and 1367.

Presently before the court is defendants' motion for summary judgment. Because I find that there are questions of fact for the factfinder, I will deny defendants' motion for summary judgment as to plaintiff's claims of violations of the Electronic Communications Privacy Act, the Wisconsin Communications Privacy Act and right to privacy (intrusion on the privacy of another) as to all defendants as well the Electronic Storage Communications Act as to defendants Connor and Mt. Olive and defamation as to defendants Salzmann and Janiszewski. In contrast, because no genuine issue of material fact exists, I will grant defendants' motion for summary judgment as to plaintiff's claims of viola-

tions of the Computer Fraud and Abuse Act as to all defendants, the Electronic Storage Communications Act as to defendants Salzmann and Janiszewski and defamation as to defendants Connor and Mt. Olive. In addition, plaintiff has stipulated to the dismissal of his remaining claims, including public disclosure of private facts (right to privacy), trespass, breach of contract, tortious interference with a contract, intentional infliction of emotional distress and false imprisonment.

From the proposed findings of fact and the record, I find the following material facts to be undisputed.

## UNDISPUTED FACTS

Defendant Mt. Olive Lutheran Church, Inc. employed plaintiff Randall David Fischer as its Minister of Youth and Children's Ministries by virtue of a "call." Plaintiff's employment obligations included providing counseling services to minors and adults on an as needed basis. Defendant Rose C. Salzmann is the secretary of the Mt. Olive church and shared an office at the church with plaintiff. Defendant Ray Connor is the pastor and defendant Sandra K. Janiszewski is the business manager at Mt. Olive.

The church's bylaws dictate that plaintiff's call can be revoked only by a 2/3 vote of the congregation. By acceptance of the call, plaintiff agreed:

to teach faithfully the Word of God, the Sacred Scriptures, in its truth and purity and as set forth in all symbolical books of the Evangelical Lutheran Church: To exemplify the Christian faith and life, to function in an atmosphere of love and order characteristic of the Body of Christ at work, and to lead others toward Christian maturity: To show a due concern for all the phases of mission and ministry.

In late 1998 and early 1999, plaintiff was criticized by board members, who indicated that they had received complaints about plaintiff's job performance, both as minister of youth and children's ministries and as the church's interim director of preschool education. The personnel committee gave plaintiff a negative performance review and advised him of areas that needed improvement.

In the spring of 1998 or 1999, plaintiff opened a Microsoft Hotmail email account from a computer terminal at the Scofield Public Library. The Hotmail account is web-based, free and resides on a server that is part of the Microsoft Network. Plaintiff used his Hotmail account for personal purposes. (In his complaint, plaintiff stated that he used his Hotmail account for both business and personal purposes, but at his deposition he stated that he used the account for personal purposes only.) At the time he opened his Hotmail account, plaintiff did not own a computer or subscribe to any internet service provider. Defendant Mt. Olive did not have internet access until early 1999. Plaintiff accessed his Hotmail account from the church's computers using the church's internet service provider, among other places.

On the morning of June 10, 1999, plaintiff arrived early at the church and read his email messages on his Hotmail account. Plaintiff saw that he had received an email message from "John Jacobsen," who asked that plaintiff call him. Plaintiff did not recognize the name immediately. At approximately 10:00 a.m., plaintiff informed defendant Salzmann that he was going down the hall to the associate pastor's office, without telling her that he was going to make a telephone call. Plaintiff often used this vacant office for telephone calls. He shared a small office with defendant Salzmann. Defendant Connor had told plaintiff to use the office to make personal phone calls or in any situation in which he needed privacy.

A short time later, defendant Salzmann left her office to place schedules in the mail trays. She took along a cordless telephone because her primary job is answering the telephone. The church has six telecommunication lines, two for computers and four for telephones. The cordless phone ties into one line of the telephone system. Calls ring on the cordless phone as well as on the hardwired phones located throughout the church. Because defendant Salzmann received church-related calls at home, she tried to call home to check her answering machine for messages. Instead of hearing a dial tone, she heard two male voices involved in a sexually graphic conversation. She recognized one voice as plaintiff's. According to plaintiff, the other man on the telephone was John Jacobsen, a tutor he had known in college who was having a sexual identity crisis to whom he was listening as Jacobsen talked about his sexual experiences and feelings, at times in graphic detail. Plaintiff was unsure how to react to Jacobsen but because he was trained as a counselor to listen to people, he did so. (According to defendant Salzmann, she heard the other person ask, "Did you go down on him?" and plaintiff responded, "Yeah, I had a few drinks and then I went to the fitness center and this guy was looking at my ass." Plaintiff states that neither party made these statements and that he did not make any pornographic or obscene statements, comments, questions or noises during the entire telephone call.)

Plaintiff is neither homosexual or bisexual; he is happily married with four young children.

Defendant Salzmann became concerned about the possibility of improper contact between plaintiff and children participating in the church's youth programs, given plaintiff's position in the church. Shaking from fear and shock, defendant Salzmann walked to defendant Janiszewski's office because she believed the conversation she had overheard was an extremely serious matter that should be witnessed by another employee. Defendant Salzmann gave defendant Janiszewski the cordless phone and whispered something about plaintiff's being on the line. Defendant Salzmann was so frightened that she had to sit down. (Defendant Janiszewski heard a voice describing graphically how to insert objects into a person's bowels without injuring the bowels and then she heard the other person stating that he would like to split plaintiff's bowels. Plaintiff states that neither party made these statements.) At first, defendant Janiszewski believed that the caller was threatening violence to plaintiff or others at the church and instructed defendant Salzmann to use another phone line to call the police, which Salzmann did. (Defendant Janiszewski then heard a voice stating he wanted to feel his balls hitting the other person's ass and the other person making "noises of pleasure." Defendant Janiszewski suddenly realized that the voice she had been hearing was plaintiff's. Defendant Janiszewski heard plaintiff describe how he was "fucking" the other man and how "hot" the other man was while both voices made "noises of sexual excitement." Defendant Janiszewski heard both parties use the word "fuck" repeatedly, discuss plaintiff's penis size and tell each other how "hot" and "great" he was. Defendant states that he did not make any of these statements and that neither party made sounds of pleasure or discussed bowels or anal intercourse.)

From down the hallway, defendant Salzmann motioned to defendant Janiszewski. Defendant Janiszewski gave the cordless phone to her daughter, Angela, and went down the hallway and spoke with Salzmann. Defendant Salzmann was on the telephone with the police dispatcher, who was asking whether defendant Janiszewski

wanted an officer dispatched to the church. Because of the violent sexual descriptions she had overheard on the phone and because she had witnessed plaintiff's temper in the past, defendant Janiszewski answered yes. (Plaintiff denies that he has a violent temper.)

Defendant Janiszewski returned to her office, retrieved the telephone from her daughter and resumed listening. (From what was being said and from the various groans and noises she heard, defendant Janiszewski believed the two men were masturbating. Defendant Janiszewski then heard plaintiff state how great "it" had been for him and the other man responded that "it" had been great for him too and how "hot" plaintiff was. Defendant states that neither party was groaning or making noises and that neither party made any of these statements.)

(Defendant Janiszewski heard plaintiff ask the other person whether he had found the internet site he had told him about and the other person responded, "yes" and they both agreed it was a great site. Plaintiff states that neither party discussed internet sites.)

Defendant Salzmann was still on the telephone with the police dispatcher when plaintiff's call with Jacobsen ended. Defendant Janiszewski spoke to the dispatcher and requested that an officer be sent to the church to remove plaintiff from the premises because she was scared and repulsed by the conversation. The dispatcher asked defendant Janiszewski whether a minor had been involved in the conversation. Although defendant Janiszewski believed that the other voice was an adult, she was unsure. According to the police report, defendant Salzmann stated, "I would estimate the other person's age as 18 or older."

Only plaintiff, Angela and defendants Salzmann and Janiszewski were in the church at the time. Defendants Janiszewski and Salzmann were too frightened to work with plaintiff in the building. Defendant Janiszewski walked down the hallway and confronted plaintiff about his phone conversation and asked him to leave the building. Plaintiff thought that he had been accused of participating in an obscene conversation over the internet on the church's computer. He left the building approximately 10 minutes later. Plaintiff went home and discussed defendant Janiszewski's accusations with his wife and whether he would need to hire a lawyer, how they would pay for the lawyer and whether it would be possible to borrow against a life insurance policy to pay attorney fees.

After plaintiff left the church, defendant Janiszewski called defendant Connor and described briefly what had transpired. A police detective called the church and asked defendants Salzmann and Janiszewski to come to the police station and provide statements. As defendants Salzmann and Janiszewski were about to leave for the station, defendant Connor arrived. Defendants Connor, Salzmann and Janiszewski decided to examine the vacant office and found very wet tissue in the wastebasket, which defendant Connor thought was fresh semen. According to plaintiff, he left nothing in the wastebasket and has never masturbated on the church's premises. In order to preserve the tissues, Angela Janiszewski placed them in a bag. Defendants Salzmann and Janiszewski then went to the police station to give their statements.

Shortly after defendants Salzmann and Janiszewski returned to the church, plaintiff returned as well. Defendant Connor met with plaintiff in Connor's office to discuss what had happened. Defendant Janiszewski joined the meeting when the church's lawyer advised Janiszewski that a witness should be present at any meetings

with plaintiff. Defendant Connor told plaintiff that he was being suspended with pay pending an investigation. (According to defendants Connor and Janiszewski, plaintiff stated that he had told his wife "everything" and that his marriage was over, that he had nothing left to live for and that he had checked his life insurance policy to assure his family would be adequately provided for and that he was contemplating suicide. Plaintiff states that defendant Connor refused to listen to him and that he told Connor only that a suspension would ruin his reputation in the church and community and that he had told his wife of defendants' accusations.)

The two detectives who took statements from defendants Salzmann and Janiszewski arrived at the church looking for plaintiff out of concern for his well being, given the events reported to them by Salzman and Janiszewski. (It is unclear from the proposed facts why the detectives would have been concerned about plaintiff's well being at this time.) Defendants Salzmann and Janiszewski told the detectives that plaintiff was meeting with defendant Connor. The detectives left the church without speaking to either plaintiff or Connor.

During his meeting with plaintiff, defendant Connor became concerned that plaintiff might harm himself. He stepped out of the meeting and asked defendant Salzmann to call the police, which she did. The same two detectives returned immediately and interviewed both plaintiff and defendant Connor. Defendant Connor told the detectives that comments plaintiff made during the meeting led him to believe that plaintiff was suicidal. Defendant Connor did not ask the police to take any particular action; his purpose in calling was only to have the police make an assessment of plaintiff's mental condition and take whatever action they deemed appropriate. According to Detective Steven Meilahn, plaintiff told both detectives that "after the incidents of the morning, [plaintiff] went home to check his life insurance and that he just wanted to go to the swimming pool and hug his wife and children" and Meilahn concluded that "[i]n my mind, our interview confirmed the concerns of Pastor Connor." Relying on their own assessment, the detectives concluded that it would be appropriate to detain plaintiff at North Central Health Care pursuant to Wis. Stat. § 51.15. Plaintiff asked whether he could see his wife and kids before he was taken to North Central and the detectives told him no. As plaintiff left with the detectives, he asked defendant Connor to tell his wife "what happened." Plaintiff was held overnight at North Central involuntarily.

Defendant Connor went to plaintiff's home and told his wife "what happened." Plaintiff's wife, Joanne Fischer, states that defendant Connor told her that plaintiff was a "sick" man, that he had had three or four gay relationships, that he was having a relationship with someone in Wausau, Wisconsin, and that he was suicidal.

In response to police recommendations, defendant Connor retained a computer expert, Curt Brodjieski, on June 10, 1999, to examine the church's computer files that plaintiff used and to check plaintiff's email messages for any improper sexual communications with minors. Using the church's computer, Brodjieski accessed plaintiff's Hotmail account by using a password guessed at by defendant Connor. Brodjieski printed the email messages that he found in plaintiff's Hotmail account. The emails, from senders with male names, referred to plaintiff as "my hot man," "my favorite stud" and "sweetie" and included the statements "miss you babe" and "as always you were a treat!" Plaintiff states that before June 10, 1999, there were no such email messages in his account. At defendant Connor's request, Brodjieski

disabled plaintiff's password for the church's computer system only.

On June 11, 1999, plaintiff accessed his Hotmail account in the presence of his wife and his neighbor, Linda Sundy, and found no offensive emails in his account. Sometime later the same day, plaintiff was no longer able to access his Hotmail account. Defendant Connor states that nothing had been deleted from plaintiff's Hotmail account and that no Hotmail settings or passwords had been changed.

On June 11, 1999, defendant Connor accessed plaintiff's Hotmail account again to see whether any new messages had been received that would indicate improper communications with minors. At that time, defendant Connor found two old emails, dated March 27 and April 6, 1999, which contained photographs of nude males. (It is unclear from the proposed facts why these two emails were not discovered by the computer expert on June 10, 1999.) Plaintiff states that before June 10, 1999, he had no such emails in his account.

On June 12, 1999, Defendant Connor accessed plaintiff's Hotmail account again and found a new incoming email, dated June 11, 1999, in which the sender wrote "wish I were there to give you a big kiss, hug and more this morning! You take care sweetie! Yours, Bill." Plaintiff no longer had access to his Hotmail account as of June 11, 1999.

Defendants Salzmann and Janiszewski never accessed plaintiff's Hotmail account.

On June 14, 1999, defendant Connor and Randy Balk, Chair of the Board of Elders of the church, visited plaintiff at his home to deliver his final paycheck and to encourage him to resign in order to avoid having his misconduct brought to the attention of others. Plaintiff's wife asked what documentary evidence the church had to support its claims. Defendant Connor told her that he could provide the information only if plaintiff signed a release. Plaintiff never supplied such a release.

On June 15, 1999, the Board of Elders met to discuss the possible termination of plaintiff's call for sexual misconduct that had occurred during his employment and while at work. On June 22, 1999, pursuant to the bylaws of the church, the Board of Directors met and unanimously approved a motion to schedule a meeting of the congregation to consider the termination of plaintiff's call. Plaintiff was notified in advance of both the Elders' and Directors' meetings, but he did not ask to attend.

Notice to the congregation of a special meeting to be held on July 7, 1999, for the purpose of revoking plaintiff's call was published in the June 26 and July 4, 1999 church bulletins. Ron Fischer, plaintiff's brother, secretly recorded the congregation meeting and the tape was later transcribed. The transcript shows that at the July 7 meeting, Colin Pietz, counsel for the church, outlined the nature of plaintiff's June 10 telephone call. Pietz did not refer to any emails. At the meeting, plaintiff implied that the church had no documents to support its charges. Pietz responded that he had copies of plaintiff's emails with him and asked whether plaintiff would consent to their being included in the record of the meeting. Plaintiff declined to give his consent. The contents of the emails were not disclosed to any board of the church or to the congregation. Those in attendance voted 91 to 43 (with 2 abstentions) in favor of terminating plaintiff's call effective July 9, 1999, unless plaintiff chose to resign earlier. Plaintiff refused to resign and his call was terminated on July 9, 1999.

### OPINION

#### A. *Electronic Communications Privacy Act*

The Electronic Communications Privacy Act, also known as the Wiretap Act, pro-

hibits the intentional interception of wire, oral or electronic communications and the intentional disclosure of the contents of a wire, oral or electronic communication by one knowing or having reason to know that the information was obtained through an interception that violates the act. *See* 18 U.S.C. § 2511(1)(a), (c). Defendants stipulate that plaintiff's telephone conversation constitutes a "wire communication" as defined under the act. The only issue is whether defendants intercepted plaintiff's telephone call intentionally.

Under the Wiretap Act, "intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). The act also has a provision known as the "business extension" exemption, which reads as follows:

> (5) "electronic, mechanical or other device" means any device or apparatus which can be used to intercept a wire, oral, or electronic communication other than—
>
> (a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business . . .

18 U.S.C. § 2510(5). The statute clearly exempts a cordless telephone extension that has been either (1) provided by the telephone company or (2) purchased by the subscriber from a third-party vendor, as long as the phone is being used in the ordinary course of the subscriber's business. Thus, the crux of the dispute lies in whether the cordless phone used by defendants Salzmann and Janiszewski to listen to plaintiff's conversation was "being used by the subscriber or user in the ordinary course of its business." 18 U.S.C. § 2510(5). If so, the cordless phone is not a "device" and defendants' act of interloping does not fall within the statute's definition of interception. The Wiretap Act does not define the phrase "ordinary course of its business."

The parties have set out two dramatically different versions of events with respect to the content of plaintiff's telephone conversation. Somewhat surprisingly, defendants rely on plaintiff's version of the facts in support of their position that the call was business in nature and thus outside the scope of the Wiretap Act. Specifically, defendants argue that, according to plaintiff, he was counseling Jacobsen during work hours, a task that falls within his job description, which includes counseling adults on an as needed basis. In contrast, plaintiff argues that his call was personal and that defendants Salzmann and Janiszewski had an obligation to stop listening as soon as they determined that the call was personal in nature. In failing to do so, they violated the act.

All parties cite *Watkins v. L.M. Berry & Co.,* 704 F.2d 577 (11th Cir.1983), in support of their respective positions. In that case, Watkins, a sales representative, received a call from a friend who asked about a job interview that Watkins had had with another company. *Id.* at 579. Watkins's supervisor had been listening in on the call and the upshot was that Watkins was fired the next day and she sued under the Wiretap Act. *Id.* The court held that "the general rule was if the intercepted call is a business call, then the [employer's] monitoring of it was in the ordinary course of business. If it was a personal call, the monitoring was probably, but not certainly, *not* in the ordinary course of

business." *Id.* at 582 (emphasis in original); *see also Briggs v. American Air Filter Co., Inc.,* 630 F.2d 414, 417 (5th Cir.1980) (because employer had reason to believe that employee was disclosing confidential information in violation of a confidentiality agreement, employer's use of extension phone was in ordinary course of business); *Berry v. Funk,* 146 F.3d 1003, 1009 (D.C.Cir.1998) ("if covert monitoring is to take place it must itself be justified by a valid business purpose, or, perhaps, at least must be shown to be undertaken normally") (internal citation omitted). The court noted that Watkins was at liberty to resign and that although the employer "might have been curious about Watkins' plans, . . . it had no legal interest in them." *Watkins,* 704 F.2d at 582. "[Watkins'] interview was thus a personal matter, neither in pursuit nor to the legal detriment of [the employer's] business." *Id.* at 582. I am persuaded by the court's reasoning in *Watkins.*

■ Defendants argue that according to plaintiff's version of the facts, his telephone call was a business call because he was counseling Jacobsen during work hours using his employer's telephone equipment. However, it is undisputed that defendant Connor permitted plaintiff to make personal calls on the premises. Although it is also undisputed that plaintiff's employment duties included counseling adults on an as needed basis it is unclear whether his duties encompassed conversations with an alleged college friend, such as Jacobsen, or an adult who is not member of the congregation, even if the call occurred during work hours. Viewing the facts in a light most favorable to the nonmoving party, as I must on a motion for summary judgment, I cannot conclude that plaintiff's alleged counseling of Jacobsen rendered the phone conversation business in nature.

Defendants contend that even if the call was personal in nature, they had a legal interest in continuing to listening in on it because it raised concerns regarding (1) the safety of church personnel and (2) possible church liability for improper contact between an employee and a minor. *See id.* at 582. First, I am uncertain how a private telephone conversation raised safety concerns for church personnel, however sexually graphic and homosexual in nature it may have been. Defendants fail to elaborate on their alleged concerns other than offering this conclusory statement in their brief. Second, the church might have a legal interest in continuing to listen to the conversation if plaintiff were speaking to a minor. However, it is undisputed that defendants Salzmann and Janiszewski believed that plaintiff was speaking with an adult. In *Watkins,* the court held that under the Wiretap Act, the employer "was obliged to cease listening as soon as [the employer] had determined the call was personal, regardless of the contents of the legitimately heard conversation." *Id.* at 584. At the point defendants Salzmann and Janiszewski determined that the call was personal and that plaintiff was not talking to a minor, they had an obligation to cease listening and hang up. Any legal interest the church might have had in protecting itself against plaintiff's conversation with a minor ceased to exist when defendants Salzmann or Janiszewski formed the belief that plaintiff was talking with an adult. The time at which defendants Salzmann and Janiszewski should have ceased listening is a question of fact that cannot be determined on a motion for summary judgment. *Id.* ("It is for the trier of fact to determine at what point the telephone should have been hung up."). Therefore, defendants' motion for summary judgment will be denied as to alleged violations of the Wiretap Act.

### B. *Wisconsin Communication Privacy Act*

■ In support of their motion for summary judgment as to plaintiff's claim under the Wisconsin Communication Privacy Act defendants' entire argument is as follows: "Wisconsin's Act essentially is the same as the foregoing federal law and the same analysis and arguments set forth in the preceding section for dismissing the federal claim apply to this claim." Dfts.' Mot. for Summ. J., dkt. # 17, at 7. Although defendants argue that the Wisconsin statute is "essentially" the same as the Wiretap Act, such so-called sameness is not readily apparent. *Cf.* 18 U.S.C. §§ 2510–22 and Wis. Stat. §§ 968.27–37. Suffice it to say, these two lengthy and comprehensive statutes are by no means identical twins. As the Court of Appeals for the Seventh Circuit has noted, "[a]rguments that are not developed in any meaningful way are waived." *Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir.1999); *see also Freeman United Coal Mining Co. v. Office of Workers' Compensation Programs, Benefits Review Board*, 957 F.2d 302, 305 (7th Cir.1992) (court has "no obligation to consider an issue that is merely raised, but not developed, in a party's brief"). Because defendants' brief lacks any meaningful argument or analysis as to plaintiff's claim under the Wisconsin Communications Privacy Act, I will deny defendants' motion for summary judgment as to this claim.

### C. *Electronic Communications Storage Act*

In 1986, Congress added the Electronic Communications Storage Act, also known as the Stored Communications Act, to the Wiretap Act. The Wiretap Act has been characterized as "famous (if not infamous) for its lack of clarity." *Steve Jackson Games, Inc. v. United States Secret Ser-*

*vice*, 36 F.3d 457, 462 (5th Cir.1994); *see also United States v. Smith*, 155 F.3d 1051, 1055 (intersection of Wiretap Act and Stored Communications Act "is a complex, often convoluted, area of law"). The Court of Appeals for the Fifth Circuit has held that the Wiretap Act protects email messages from being intercepted during transmission. *United States v. Turk*, 526 F.2d 654, 658 (5th Cir.1976) ("intercept" does not include "replaying of a previously recorded conversation" because acquisition was not contemporaneous with transmission); *Steve Jackson Games*, 36 F.3d at 461 (Secret Service seizure of a computer containing unread e-mail messages was not an "interception" because of lack of contemporaneity with transmission). In contrast, the Stored Communications Act indicates that an email message is protected while stored at "a facility through which electronic communication service is provided." 18 U.S.C. § 2701(a); *see also United States v. Moriarty*, 962 F.Supp. 217 (D.Mass.1997). Specifically, the Stored Communications Act states that it is a violation for anyone who:

> "intentionally accesses without authorization a facility through which an electronic communication service is provided ... and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system" violates the act.

18 U.S.C. § 2701(a). "Electronic storage" is defined as:

> (A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and

> (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication ...

18 U.S.C. §§ 2510(17) and 2711(1) (definitions of Wiretap Act applicable to Stored Communications Act).

Defendants argue that defendant Mt. Olive did not violate the act when it hired Brodjieski to access plaintiff's email account on June 10, 1999. Defendants base their argument on the fact that the language in the Wiretap Act states, "any person who ... intentionally intercepts ... or procures any other person to intercept," 18 U.S.C. § 2511(1)(a), and the Stored Communications Act states only "whoever ... intentionally accesses without authorization ...," 18 U.S.C. § 2701(a). In other words, defendants argue that the absence of the language, "or procures any other person to intercept," in the Stored Communications Act means that hiring Brodjieski to access plaintiff's email account did not violate act. Even if defendants' interpretation of the statute were correct, it does not change the outcome. Defendant Connor, a Mt. Olive employee, was present when Brojieski accessed plaintiff's email account. Moreover, he supplied Brodjieski with plaintiff's password. In other words, defendant Connor participated in accessing plaintiff's account, making his conduct that of his employer, defendant Mt. Olive. *See also* 18 U.S.C. § 2510(6) (corporation is a person under the act).

Defendants argue that defendants Connor and Mt. Olive did not violate the act when Connor accessed plaintiff's Hotmail account on June 11 and 12, 1999, because plaintiff's Hotmail email was not in "electronic storage" as defined under the act. (It is unclear why defendants do not advance this argument with respect to the June 10 accessing incident involving Brodjieski and defendant Connor.) Defendants contend that the Stored Communications Act "does not apply to the accessing of email messages in a recipient's mailbox for at that point, transmission of the messages has been completed." Dfts.' Mot. for Summ. J., dkt. # 17, at 8. In support of their position, defendants cite *Fraser v. Nationwide Mutual Insurance Co.,* 135 F.Supp.2d 623, 637 (E.D.Pa.2001). In *Fraser,* the defendant accessed the plaintiff's email that was located on the defendant's server after it had been downloaded by the recipient to his hard drive. *Id.* at 631. The court concluded that the defendant had accessed the plaintiff's email only after transmission was complete and that doing so did not violate the act because only communications accessed in the course of transmission are protected. *Id.* at 637.

The Stored Communications Act defines "electronic storage" as either temporary, intermediate storage incidental to the electronic transmission or any storage of such communication by an electronic communication service for purposes of backup protection. 18 U.S.C. § 2510(17); *see also* S.Rep. No. 99–541, 99th Cong., 2d Sess. (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3589 (noting electronic storage includes both definitions). In *Fraser,* it was undisputed that the email message accessed was not stored by an electronic communication service but was stored on the employer's server. *Fraser,* 135 F.Supp.2d at 635. In contrast, defendants Connor and Mt. Olive accessed plaintiff's email while it was stored on a remote, web-based server that is owned by Microsoft, an electronic communication service provider. *See* 18 U.S.C. § 2510(15) (defining "electronic communication service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications"). Therefore, it is unnecessary to determine whether *Fraser* held correctly that the act could be violated only by accessing email that has not yet been downloaded to the recipient's hard drive.

In fact, the legislative history shows that Congress intended the Stored Communica-

tions Act to cover the exact situation in this case, as illustrated by an example provided in the Senate Report:

> For example, a computer mail facility authorizes a subscriber to access information in their portion of the facilities storage. Accessing the storage of other subscribers without specific authorization to do so would be a violation of the act. Similarly, a member of the general public authorized to access the public portion of a computer facility would violate this section by intentionally exceeding that authorization and accessing the private portions of the facility.

1986 U.S.C.C.A.N. at 3590.

■ However, accessing plaintiff's Hotmail account intentionally is not enough in and of itself to violate the act. Plaintiff must also show that defendants obtained, altered or prevented his authorized access to his email account. *See* 18 U.S.C. § 2701(a). Interestingly, each side's version of the facts supports the other side's legal position. Plaintiff alleges that the emails never existed. If that were the case, there would have been nothing for defendants to obtain or alter and therefore they could not have violated the act. On the other hand, if defendants' version of the facts is correct, they would have obtained plaintiff's email in violation of the act. In addition, it is disputed whether defendants Connor and Mt. Olive prevented plaintiff from accessing his email account by changing his password. These are questions of fact for the factfinder. Accordingly, defendants' motion for summary judgment will be denied as to violations of the Stored Communications Act as to defendants Connor and Mt. Olive. Because plaintiff concedes that defendants Salzmann and Janiszewski never accessed his email account, I will grant defendants' motion for summary judgment as to this claim as to these two defendants.

### D. Computer Fraud and Abuse Act

Under the Computer Fraud and Abuse Act, anyone who "intentionally accesses a computer without authorization ... and thereby obtains ... information from any protected computer if the conduct involved an interstate or foreign communication" may have violated the act. 18 U.S.C. § 1030(a)(2). However, in order to maintain a civil action under the act a plaintiff must suffer "damage or loss by reason of a violation of this section." 18 U.S.C. § 1030(g). "Damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information that ... causes loss aggregating at least $5,000 in value during any 1–year period to one or more individuals." 18 U.S.C. § 1030(e)(8), and these damages "are limited to economic damages," 18 U.S.C. § 1030(g). Although "loss" is not defined in the act, courts have interpreted it to encompass remedial expenses. *See In re DoubleClick Inc. Privacy Litigation*, 154 F.Supp.2d 497, 521 (S.D.N.Y.2001) (legislative history makes "clear that Congress intended the term 'loss' to target remedial expenses borne by victims that could not properly be considered direct damage caused by a computer hacker."); *see also EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 584–85 (1st Cir. 2001).

■ Defendants argue that plaintiff has failed to produce evidence or even allege that he suffered any damage or loss as a result of defendants' acts of copying his email messages from his account. Plaintiff would have had to suffer damage or loss of at least $5,000 in order to maintain a cause of action under the act. Although plaintiff alleges that as of June 11, 1999, he could no longer access his Hotmail account because defendants allegedly changed his password, he has failed to show that he suffered any damage or loss as a result.

Therefore, I will grant defendants' motion for summary judgment as to plaintiff's claims under the Computer Fraud and Abuse Act.

### E. *Invasion of Privacy: Intrusion on the Privacy of Another*

Wis. Stat. § 895.50(2)(a) defines one type of "invasion of privacy" as an

intrusion upon the privacy of another of a nature highly offensive to a reasonable person, in a place that a reasonable person would consider private or in a manner which is actionable for trespass.

Plaintiff argues that his right to privacy under Wisconsin law was intruded upon when (1) defendants Salzmann and Janiszewski eavesdropped on his telephone conversation and (2) defendants Connor and Mt. Olive accessed his email account. Citing *Hillman v. Columbia County,* 164 Wis.2d 376, 474 N.W.2d 913 (Ct.App.1991), defendants contend that neither a telephone conversation nor an email account is "a place" under the statute. In *Hillman,* the court held that the plaintiff's medical records file was not "a place" because "the plain meaning of 'a place' is geographic." *Id.* at 392, 474 N.W.2d 913.

#### 1. *Plaintiff's telephone conversation*

■ Plaintiff concedes that a telephone conversation is not "a place." He argues, however, that at the time he was on the telephone, he was in an office that defendant Connor had instructed him to use for private telephone calls and the door to that office was closed. Therefore, plaintiff argues, the "place" is the office, not the phone conversation. Defendants counter that it is "absurd" for plaintiff to contend that he had a right of privacy when he was located in his employer's office. However, it is a question of fact whether the office that plaintiff had been instructed to use for privacy by his employer is "a place that a reasonable person would consider private." Wis. Stat. § 895.50(2)(a). Defendants ar-

gue that it is the call that was intruded upon, not the office. However, plaintiff was in a place (the office) where his privacy right was allegedly violated (via a phone extension). In other words, the fact that defendants used a phone extension to listen in on plaintiff's conversation rather than pressing an ear against the door is of no consequence. *See Restatement (Second) of Torts* § 625B cmt. b (when "A taps B's telephone wires ... A has invaded B's privacy"). Nevertheless, it is disputed whether defendants Salzmann's or Janiszewski's intrusion (listening in on plaintiff's call) is highly offensive to a reasonable person and whether it occurred in a place (the vacant office) that a reasonable person would consider private. Accordingly, I will deny defendants' motion for summary judgment as to this claim.

#### 2. *Plaintiff's email account*

■ In contrast to the telephone conversation, plaintiff's email account is analogous to the medical records file in *Hillman,* 164 Wis.2d at 391, 474 N.W.2d 913. However, I am not persuaded by the court of appeals' reasoning in that case. When there is no state supreme court precedent on point, a federal court predicts how the state's supreme court would likely decide the issue. *See Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). A federal court takes into consideration lower state court decisions, if any, but is not bound to apply and follow these decisions if it believes that they would not be affirmed by the state's supreme court. *See id.* ("[T]he State's highest court is the best authority on its own law. If there be no decision by that court then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State. In this respect, it may be said to be, in effect, sitting as a state court.")

The critical question in *Hillman* was whether the language "intrusion upon the privacy of another ... in a place that a reasonable person would consider private" encompasses other forms of private concerns such as medical records (or, in this case, an email account). *Id.* The court began its inquiry by asking "whether a file of medical records constitutes 'a place' under sec. 895.50(2)(a), Stats." *Id.* The court then compared Wisconsin's invasion of privacy statute to the language in the *Restatement (Second) of Torts* § 625B, which states as follows:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

*Id.* The court concluded that under the *Restatement*, reading a medical file could be considered an intrusion on the "solitude or seclusion of another or his private affairs or concerns," but noted that the legislature did not use the *Restatement* language but rather used the phrase, "in a place that a reasonable person would consider private." *Hillman*, at 392, 474 N.W.2d 913. (The court did not cite any legislative history indicating that the *Restatement* language was considered and rejected.) The court then consulted a dictionary and determined that " 'a place' is geographical" and "does not include a file of medical records." *Id.* I agree that the plain meaning of the word "place" is geographic in nature; however, this conclusion does not answer the question whether an intrusion can be perpetrated on a person's belongings or private concerns, which also exist geographically "in a place."

On its face, the language, "intrusion upon the privacy of another ... in a place that a reasonable person would consider private," Wis. Stat. § 895.50(2)(a), does not limit the intrusion to a person's immediate physical environment but rather encompasses a person's private belongings as long as the place these private belongings are intruded upon is one that a reasonable person would consider private. Moreover, Wis. Stat. § 895.50(3) states that "[t]he right of privacy recognized in this section shall be interpreted in accordance with the developing common law of privacy," which supports a reading in accordance with the general common law as reflected by the *Restatement. See Restatement (Second) of Torts* § 625B cmt. b (intrusion on privacy of another "may be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit inspection of his personal documents"); *see also Sack on Defamation, Libel, Slander and Related Problems* § 12.2.2 (3rd ed.2001) (examining right of privacy in each state).

Because it is disputed whether accessing plaintiff's email account is highly offensive to a reasonable person and whether plaintiff's email account is a place that a reasonable person would consider private, I will deny defendants' motion for summary judgment as to this claim.

### F. *Defamation*

Plaintiff contends that defendants defamed him by reporting falsely to the Board of Directors that he "was an active participant in a telephone conversation with graphic sexual content, including homosexual acts and encounters, sodomy, and other acts of depravity" and that the "Board of Elders communicated this information to the Board of Directors." (Plaintiff alleged other defamatory acts in his complaint, but has not opposed defendants'

motion for summary judgment as to these allegations. Therefore, defendant's motion for summary judgment will be granted as to all other defamatory acts alleged in the complaint. As explained earlier, arguments not developed in any meaningful way are waived. *See Central States,* 181 F.3d at 808.)

 "A communication is defamatory if it tends to harm the reputation of another so as to lower that person in the estimation of the community or deter third persons from associating with him or her." *Vultaggio v. Yasko,* 215 Wis.2d 326, 572 N.W.2d 450 (1998); *see also Zinda v. Louisiana Pacific Corp.,* 149 Wis.2d 913, 440 N.W.2d 548 (1989). If the statements are capable of both a non-defamatory and defamatory meaning, it is up to the jury to decide how the statement was understood by its recipients. *See Wozniak v. Local 1111 of UE,* 57 Wis.2d 725, 732, 205 N.W.2d 369, 373 (1973). Privileged defamations are either absolute or conditional. *See Lathan v. Journal Co.,* 30 Wis.2d 146, 151–52, 140 N.W.2d 417 (1966).

### 1. *Consent (absolute privilege)*

 Consent to the publication is an absolute defense. *See Restatement (Second) of Torts* § 583. "Absolute privileges give complete protection without any inquiry into the defendant's motives." *Zinda,* 149 Wis.2d at 922, 440 N.W.2d at 552. The extent of the privilege is determined by the terms of the consent. *See Restatement (Second) of Torts* § 583 cmt. d.

 It is undisputed that when plaintiff accepted his call the bylaws specified that his call could be revoked only by a 2/3 vote of the congregation. Therefore, defendant argues, by accepting his call, plaintiff consented to the publication of information relating to the suitability of his continued employment with the church, which includes defendants' version of the telephone conversation. I am unpersuad-

ed that defendants can be protected by this absolute privilege because there is no evidence of consent. The bylaws that defendants cite were neither part of plaintiff's call nor incorporated by reference into his Diploma of Vocation, the document in which he accepted his call formally. Other than the bylaws, defendants do not refer to any other evidence to support their contention that plaintiff consented to the publication.

### 2. *Common interest (conditional privilege)*

Defendants argue that the common interest privilege protects defendants' alleged defamatory disclosure to the Board of Directors or voting members of the church. Section 596 of the Restatement defines the "common interest" privilege as:

> An occasion makes a publication conditionally privileged if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know.

*Restatement (Second) of Torts* § 596. "The common interest privilege is based on the policy that one is entitled to learn from his associates what is being done in a matter in which he or she has an interest in common" and "is particularly germane to the employer-employee relationship." *Zinda,* 149 Wis.2d at 923, 440 N.W.2d at 552. In the area of conditional privilege, the Wisconsin Supreme Court has endorsed the language of the *Restatement (Second) of Torts. Id.* at 922, 440 N.W.2d 548. Comment e of the *Restatement* elaborates on the contours of the common interest privilege with respect to religious organizations:

> The common interests of members of religious … associations … is recognized as sufficient to support a privilege

for communications among themselves concerning the qualifications of the officers and members and their participation in the activities of the society. This is true whether the defamatory matter relates to alleged misconduct of some other member that makes him undesirable for continued membership, or the conduct of a prospective member. *Restatement,* § 596 cmt. e.

It is clear that defendants' allegedly defamatory statements are conditionally privileged. *See Hett v. Ploetz,* 20 Wis.2d 55, 59–60, 121 N.W.2d 270 (1963) ("Where words imputing misconduct to another are spoken by one having a duty to perform, and the words are spoken in good faith, and in the belief that it comes within the discharge of that duty, or where they are spoken in good faith to those who have an interest in the communication, and a right to know and act upon the facts stated, no presumption of malice arises from the speaking of the words, and therefore no action can be maintained in such cases without proof of express malice.").

■■■ "However, a conditional privilege is not absolute and may be forfeited if the privilege is abused." *Zinda,* 149 Wis.2d at 924, 440 N.W.2d at 553. The *Restatement* lists five conditions that may constitute an abuse of a conditional privilege, including the following: (1) a defendant knows the matter to be false or acts in reckless disregard as to its truth or falsity, *see* §§ 600–602; (2) the defamatory matter is published for some purpose other than that for which the particular privilege is given, *see* § 603; (3) the publication is made to some person not reasonably believed to be necessary for the accomplishment of the purpose of the particular privilege, *see* § 604; (4) the publication includes defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged, *see* § 605; or (5) the publication includes unprivileged mat-

ter as well as privileged matter, *see* § 605A. *See also Zinda,* 149 Wis.2d at 924, 440 N.W.2d at 553.

■■■ Plaintiff contends that defendants' conditional privilege was forfeited because defendants Salzmann and Janiszewski knew that their version of the events was false. Viewing the evidence in a light most favorable to the non-moving party, I conclude that plaintiff has adduced evidence that defendants Salzmann and Janiszewski made false statements to the Board of Directors about plaintiff's role in the telephone conversation. "[W]hether a conditional privilege has been abused is a factual question for the jury, unless the facts are such that only one conclusion can be reasonably drawn." *Id.* at 926, 440 N.W.2d at 553–54. Therefore, it is for the factfinder to determine whether defendants Salzmann's and Janiszewski's version of the telephone conversation was false. However, plaintiff has not adduced evidence that defendant Connor knew the alleged falsity of defendants Salzmann's and Janiszewski's version of the telephone conversation or that he acted with reckless disregard as to the truth or falsity of their assertions. Therefore, I will deny defendants' motion for summary judgment as to plaintiff's defamation claims as to defendants Salzmann and Janiszewski only and grant their motion as to defendants Connor and Mt. Olive.

### G. *Other Claims*

Plaintiff stipulates to the dismissal of Counts VII–XIII, which include public disclosure of private facts, trespass, breach of contract, tortious interference with a contract, intentional infliction of emotional distress and false imprisonment.

### ORDER

IT IS ORDERED that

1. The motion for summary judgment filed by defendants Mt. Olive Lutheran

Church, Inc., Ray Connor, Sandra K. Janiszewski and Rose C. Salzmann against plaintiff Randall David Fischer ·is DENIED in part and GRANTED in part as follows: (a) DENIED as to claims under the Electronic Communications Privacy Act; (b) DENIED as to claims under the Wisconsin Communication Privacy Act; (c) DENIED as to defendants Connor and Mt. Olive and GRANTED as to defendants Salzmann and Janiszewski as to claims under the Electronic Storage Communications Act; (d) GRANTED as to claims under the Computer Fraud and Abuse Act; (e) DENIED as to right to privacy claims under Wis. Stat. § 895.50(2)(a) (intrusion upon the privacy of another); and (f) DENIED as to defendants Salzmann and Janiszewski and GRANTED as to defendants Connor and Mt. Olive as to claims of defamation; and

2. Plaintiff's claims of public disclosure of private facts (public disclosure of private facts), trespass, breach of contract, tortious interference with a contract, intentional infliction of emotional distress and false imprisonment are DISMISSED.