181 F.3d 799 (7th Cir. 1999)
 CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, a pension trust, and HOWARD MCDOUGALL, trustee, Plaintiffs-Appellees, Cross-Appellants,
v.
MIDWEST MOTOR EXPRESS, INC., a North Dakota corporation, MME, INC., MIDNITE EXPRESS, INC., and EXPRESS CARTAGE, INC., Defendants-Appellants, Cross-Appellees.
 Nos. 98-2512, 98-2588
 United States Court of Appeals, Seventh Circuit
 Argued February 11, 1999
Decided June 9, 1999[1]
 
 Appeals from the United States District Court for the Northern District of Illinois, Eastern Division. No. 94 C 2561--Wayne R. Andersen, Judge.[Copyrighted Material Omitted][Copyrighted Material Omitted]
 Before CUMMINGS, BAUER, and EVANS, Circuit Judges.
 TERENCE EVANS, Circuit Judge.
 
 
 1
 The defendants, primarily attacking with broad constitutional principles, are here contesting a huge bill they received in this ERISA case. The plaintiffs not only defend the big bill but seek to jack it up a tad or two. We start by introducing the parties and explaining the intricacies of their claims and defenses.
 
 
 2
 Midwest Motor Express, Inc. and its affiliates, MME, Inc., Midnite Express, Inc., and Express Cartage, Inc. (collectively Midwest), withdrew from the Central States, Southeast and Southwest Areas Pension Fund (Central States) in April 1994. Central States then sued Midwest under the Employment Retirement Security Act (ERISA), 29 U.S.C. sec. 1001 et seq., as amended by the Multiemployer Pension Plan Amendments of 1980 (the MPPAA), id. sec. 1381 et seq., for withdrawal liability of about $2.5 million dollars. On cross-motions for summary judgment the district court sided with Central States. Midwest appeals, arguing that the district court lacked subject matter jurisdiction and, more boldly, that imposition of retroactive withdrawal liability (to the tune of about $1.8 million of the total) amounts to an unconstitutional taking and a violation of economic substantive due process. Central States cross-appeals, arguing that the district court had jurisdiction over its ERISA claims but that Midwest had waived its constitutional claims, which, Central States urges, should be denied if they are to be heard at all, and that the district court erred in several technical determinations about the damages.
 
 
 3
 Midwest, a North Dakota trucking corporation, participated in the Central States pension plan from 1958 to 1994. Central States is a multiemployer pension plan that provides pension benefits to employees whose employers have collective bargaining agreements with the International Brotherhood of Teamsters. In a multiemployer pension plan, trustees appointed by the parties to the union contracts, advised by actuarial experts, set the level of contributions that employers must pay. The trustees also set a certain level of benefits to be paid to employees if they remain employed for specified periods. Central States is administered by eight trustees, four from management and four from the Teamsters.
 
 
 4
 Midwest began contributing to Central States in 1958 and made all required contributions until it withdrew in 1991. Until 1990 Midwest dealt with Central States through Regional Carriers, Inc., an association of trucking employers that Midwest made its agent for collective bargaining with the Teamsters. Midwest never appointed its own trustee to the Central States board of trustees but was represented by the management trustees appointed by Regional Carriers. In 1990 Midwest withdrew from Regional Carriers in order to negotiate a separate, single-employer agreement with the Teamsters. One of the contested issues was whether to continue to participate in the Central States plan from which Midwest wished to withdraw. The contract negotiations were not successful. Unionized Midwest employees struck in August 1991. Negotiations continued, but in October 1991 Midwest legally hired permanent replacements for some of the strikers. In April 1994 Midwest's employees decertified the Teamsters as their representative and the strike ended. The decertification also ended Midwest's obligation to contribute to Central States.
 
 
 5
 The statutory framework governing relations between the parties is the MPPAA, an amendment to ERISA. ERISA was enacted in 1974 to protect employee pensions from termination because of underfunding among other risks. "Congress wanted to guarantee that if a worker has been promised a defined pension benefit . . . [which had vested] he will actually receive it." Concrete Pipe and Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal., 508 U.S. 602, 607 (1993) (internal citations omitted). Initially, under ERISA, multiemployer plans were only guaranteed at the discretion of the Pension Benefit Guaranty Corp. (PBGC), determinations about payouts being made on a case-by-case basis. 29 U.S.C. sec. 1381(c)(1) (superseded). After 1978 the guarantees were to be mandatory. Id. sec. 1381(c)(2) (superseded). Employers withdrawing from an ongoing multiemployer plan in that period thus incurred a contingent liability. Congress, however, became concerned about the stability of multiemployer plans and the cost of the guarantee. It determined that "the possibility of liability upon termination of a plan created an incentive for employers to withdraw from weak multiemployer plans." Concrete Pipe, 508 U.S. at 608 (1993). Congress enacted the MPPAA to remedy this situation.
 
 
 6
 The main relevant features of the MPPAA are that (1) it created mandatory withdrawal liability for withdrawing employers, who must immediately begin to pay a fixed debt to the plan in which they had participated, Pieck v. Pension Benefit Guaranty Corp., 724 F.2d 1247, 1255 (7th Cir. 1983); 29 U.S.C. sec. 1381(a); (2) the liability is for a proportionate share of the plan's unfunded vested benefits, id. sec. 1381(b) and sec. 1391 (methods of computing withdrawal liability); Concrete Pipe, 508 U.S. at 609; and (3) the MPPAA has a retroactive aspect, since the withdrawal liability "imposes on the withdrawing employer a share of the unfunded vested liability proportional to the employer's share of contributions to the plan during the years of its participation," Concrete Pipe, 508 U.S. at 610, even if the "years of its participation" in the plan preceded the effective date of the MPPAA[2] or the enactment of ERISA itself.
 
 
 7
 On April 26, 1994, Central States issued an assessment of withdrawal liability and a demand for payment in the amount of $2,546,439.39, listing Midwest's "pre-1980 pool liability" as $1,814,856.36 and its "post-1979 pool liability" as $731,582.94. The "pre-1980 pool liability" is the retroactive withdrawal liability imposed by the MPPAA, effective from 1980, the year specified in the amendment. On the same day that Central States issued the assessment and demand for payment (April 29, 1994) Central States sued Midwest on this liability in the United States District Court for the Northern District of Illinois. Midwest received that notice and demand on the following day. In May Midwest sued Central States in federal district court in the District of North Dakota, seeking a declaration that the assessment of retroactive withdrawal liability was unconstitutional and that any collection should be enjoined. The case was transferred to the Northern District of Illinois on Central States' motion. Midwest appealed the transfer to the Eighth Circuit, which affirmed, and to the Supreme Court, which denied certiorari. Midwest agreed in September 1996 to make interim payments of $31,000 a month, which it has done.
 
 
 8
 Midwest requested arbitration in October 1994, and the parties agreed that the arbitrator would answer stipulated factual questions. Midwest does not contest the actuarial soundness of the assessment or the amount in question, but only whether Midwest can be constitutionally held to any retroactive withdrawal liability. The arbitrator's decision and award of May 20, 1997, made the following findings: (1) Midwest is a pre-ERISA employer, that is, its participation in Central States, beginning in 1958, antedates the enactment of ERISA in 1974; (2) Midwest's withdrawal from Central States was involuntary; (3) Central States is a defined benefit pension plan covered by Title IV of ERISA rather than a defined contribution plan, and while it is not a hybrid Taft-Hartley pension plan within the meaning of ERISA, it is a "hybrid plan" in the sense intended in Justice O'Connor's concurrence in Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 232-236 (1986); and (4) that Midwest had little, but some, control over the benefit and contribution levels and other factors that produced unfunded vested benefits from 1973 to Midwest's withdrawal in 1991.
 
 
 9
 Against this background, the district court decided cross-motions for summary judgment in favor of Central States. The parties cross-appeal as explained. We review a district court's grant of summary judgment de novo, applying the same standards as the court below and viewing the record and all reasonable inferences to be drawn from it in the light most favorable to the nonmoving party. Fulk v. United Transp. Union,160 F.3d 405, 407 (7th Cir. 1998). Summary judgment is appropriate if there are no genuine issues of material fact in dispute. Mills v. Health Care Serv. Corp., 171 F.3d 450, 453 (7th Cir.1999); Fed. R. Civ. P. 56(c). An arbitrator decides facts by a preponderance and his findings of fact may be set aside only if clearly erroneous. See Jos. Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan, 3 F.3d 994, 999 (7th Cir. 1993) (interpreting 29 U.S.C. sec. 1401(c)).[3] The same standard holds for the arbitrator's application of law to fact. Id.; Chicago Truck Drivers Pension Fund v. Louis Zahn Drug Co., 890 F.2d 1405, 1409-1411 (7th Cir. 1989). The arbitrator's legal conclusions are subject to de novo review. Id.; Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp., 872 F.2d 208, 211-212 (7th Cir. 1989).
 
 
 10
 Each party raises questions about whether any federal court may hear the arguments of the other side. Because Central States sued before Midwest defaulted on the withdrawal liability assessment, indeed before Midwest had even received the assessment and demand for payment, Midwest contends that Central States' claim is not ripe. The Eighth Circuit rejected this argument, see Midwest Motor Express, Inc. v. Central States Southeast and Southwest Area Pension Fund, 70 F.3d 1014, 1017 (1996), and we concur. Here Midwest attempts to play a double game, conceding in its declaratory judgment action as plaintiff the premise that would make Central States' action ripe, i.e., that Midwest believes that it has no retroactive withdrawal liability and therefore need not pay, while arguing in Central States' MPPAA action as defendant that this very predicate was not established. A litigant may not take away with one hand what it gives with the other. See DeGuiseppe v. Village of Bellwood, 68 F.3d 187, 191 (7th Cir. 1995) (judicial estoppel "prevents a party who has successfully taken a position in one litigation from taking the opposite position in a subsequent litigation"). Having prevailed on the jurisdictional issue there, which is how it came to lose on the merits here, Midwest cannot now say that federal jurisdiction is wanting.
 
 
 11
 Furthermore, even if there were jurisdictional problems when Central States filed its initial complaint, Central States remedied them when it filed a second amended complaint, by which time Midwest was clearly refusing to pay. See Ford v. Neese, 119 F.3d 560, 563 (7th Cir. 1997) (jurisdictional defects can be cured by amending complaint).
 
 
 12
 For its part, Central States argues that Midwest waived the challenge by not raising it in arbitration. Any objection to an MPPAA withdrawal liability assessment not raised by the employer in the arbitration is waived. See Central States, Southeast & Southwest Areas Pension Fund v. Slotky, 956 F.2d 1369, 1373 (7th Cir. 1992). In the instant case, however, the parties agreed in 1996 that they would develop only the facts of the case at arbitration. The arbitrator specifically declared that by stipulation of the parties he would not address any legal issue, and the district court knew all along that Midwest was simply holding off on its constitutional challenge until after the arbitration. Therefore, Midwest did not waive its constitutional challenge to withdrawal liability.
 
 
 13
 Central States also contends that Midwest's constitutional challenge is time-barred because Midwest failed to file suit in district court to "enforce, vacate, or modify the arbitrator's award" within 30 days as the MPPAA requires. See 29 U.S.C. sec. 1401(b)(2). The district court, however, correctly found that Midwest is not suing to "enforce, vacate, or modify the arbitrator's award" because the arbitrator's decision did not address the constitutionality of the statute. And even if Midwest were time-barred from raising its constitutional challenge as a plaintiff, the 30-day limit does not bar Midwest from raising these claims as a defense when it is sued by Central States. Both parties may therefore be heard in federal court. We proceed to the merits.
 
 
 14
 Midwest's central argument on appeal is that the MPPAA as applied is unconstitutional because it violates substantive due process. As the district court put it, a party challenging an economic regulation on substantive due process grounds faces "an uphill climb." This may be a bit of an understatement. The courts review economic regulations with a strong presumption of constitutionality. The challenger must show that a legislature has acted in an arbitrary and irrational way. See Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 729 (1984). Congress, of course, is not obligated to choose the legislative scheme that a reviewing court would find to be the best or fairest means to the legislative end, but simply one that is rationally related to that end. See National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co., 470 U.S. 451, 477 (1985). The Supreme Court has not invalidated any economic regulation on substantive due process grounds since 1938, and we have remarked that it "may be right" that "merely 'economic' regulations can never flunk the test of rationality." Central States, Southeast & Southwest Areas Pension Fund v. Lady Baltimore Foods, Inc., 960 F.2d 1339, 1343 (7th Cir. 1992).
 
 
 15
 Midwest argues that the MPPAA violates its substantive due process rights because the statute imposes a retroactive liability that Midwest never agreed to assume and never could have anticipated. But even where, as here, a question of retroactivity is involved, "legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and . . . the burden is on the one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." In re Gifford, 688 F.2d 447, 453 (7th Cir. 1982) (en banc) (quoting Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15 (1976)); see also Brach v. Amoco Oil Co., 677 F.2d 1213, 1224-1225 (7th Cir. 1982). Economic regulation will be upheld, even without any express findings or legislative history, if there is "any reasonably conceivable state of facts that could provide a rational basis" for the legislation. FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993).
 
 
 16
 With the MPPAA, Congress has set forth its reasons in detail. "The purpose [of imposing withdrawal liability on a withdrawing employer] is to relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers." H.R. Rep. No. 96-869, at 67, reprinted in 1980 U.S.C.C.A.N. 2918, 2935. In view of this clearly legitimate aim, we cannot say that the scheme is irrational or arbitrary. The means chosen by [Congress are] "'reasonably adapted to the end permitted by the Constitution.' It is not for us to say whether the means chosen by Congress represent the wisest choice." Federal Energy Regulatory Comm'n v. Mississippi, 456 U.S. 742, 758 (1982) (internal citations omitted). Finally, the Supreme Court has repeatedly held that the MPPAA is constitutional on its face. See Concrete Pipe, 508 U.S. at 646-647; Connolly, 475 U.S. at 228.
 
 
 17
 That would normally more than end the matter, but Midwest cites Justice O'Connor's concurrences in Connolly, 475 U.S. at 228 (joined by Justice Powell), and Concrete Pipe, 508 U.S. at 647. Justice O'Connor emphasized that the issue of whether the MPPAA might be defeated in an "as applied" challenge was not resolved in either case:
 
 
 18
 [T]he Court's opinion should not be read to imply that employers may be subjected to retroactive withdrawal liability simply because "pension plans [have] long been subject to federal regulation." Surely the employer that joined a multiemployer plan before ERISA had been promulgated--before Congress made employers liable for unfunded benefits--might have a strong constitutional challenge to retroactive withdrawal liability.
 
 
 19
 Concrete Pipe, 508 U.S. at 649 (O'Connor, J., concurring). Justice O'Connor envisions a case where there is absolutely no rational connection between conduct by the employer and the detriment to pension beneficiaries that Congress is trying to avoid. In general, pension plans fall into two categories: defined benefit plans and defined contribution plans. MPPAA imposes withdrawal liability only on employers participating in defined benefits plans. Essentially, the Act treats the defined benefits as promises for which the employer is responsible.
 
 
 20
 The problem is that many multiemployer plans like the one in the instant case have both defined contributions and defined benefits. Employers like Midwest and their unions bargain for a specified level of contributions by the employer. But neither the employer nor the union has a direct say in determining the level of benefits. The plan trustees (appointed equally by the employers and the union) determine the level of benefits according to actuarial assessments of the plan's value and future performance. When these assessments are too conservative, the plan ends up with a surplus that can be applied to future benefits. When the assessments are too optimistic, unfunded benefits result.
 
 
 21
 Who should be responsible for the unfunded benefits? Congress has said through the MPPAA that withdrawing employers are responsible for their proportionate share of existing unfunded benefits when they leave. Justice O'Connor is concerned that in some cases the connection between the actions of a given employer and the unfunded benefits can be so attenuated that holding them liable for it could amount to an arbitrary, irrational action by Congress.
 
 
 22
 The issue in the instant case, then, is whether holding Midwest responsible for a proportionate share of the unfunded benefits is irrational. Multiemployer plans like the one at issue here try to be all things to all people. They promise employers that they will only have to pay specified contributions, and they promise employees defined benefits. Because performance predictions cannot be perfect, there will always be shortfalls and surpluses. Inevitably, someone is not going to get what they expected out of the plan. Congress has decided that protecting employee pension benefits is more important than respecting the expectations of employers. Placing the burden of protecting the employee benefits on withdrawing employers may not be the wisest or even the fairest course of action. Congress could have decided to insure pension plans with taxpayer dollars, for example. Imposing withdrawal liability on Midwest is, however, a perfectly reasonable means of securing Congress' legitimate legislative goal of protecting the pension benefits of the Central States beneficiaries. Considering the extremely deferential view that a majority of the Supreme Court still takes toward economic regulation, Midwest's substantive due process argument must fail.
 
 
 23
 A somewhat more promising basis for a constitutional challenge to economic regulation is provided by the Takings Clause: "[N]or shall private property be taken for public use without just compensation." U.S. Const. amend. V, cl. 5. See National Paint & Coatings Ass'n v. City of Chicago, 45 F.3d 1124, 1130 (7th Cir. 1995). Midwest relies upon the Supreme Court's plurality opinion in Eastern Enterprises v. Apfel, 118 S. Ct. 2131 (1998), striking down an employer's liability for health benefits for former employees under the Coal Act. The challenged legislation, as applied to that employer, was an unconstitutional taking because it "impose[d] severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability [was] substantially disproportionate to the parties' experience." Eastern Enterprises, 118 S. Ct. at 2149. Midwest claims that the MPPAA as applied to itself is an unconstitutional taking for the same reasons.
 
 
 24
 We evaluate the Takings Clause challenge under the standards for a "regulatory" taking rather than a permanent physical occupation of real property. The Supreme Court applied a "regulatory takings" analysis to ERISA in Concrete Pipe, 508 U.S. at 643-644, and Connolly, 475 U.S. at 224- 225. The Court eschews a set formula for identifying a regulatory taking, looking instead to the particular facts of the case. Id. at 224. The Court has, however, identified three factors as being of "particular significance": (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." Id. at 224-225; Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978). Eastern Enterprises does not modify this traditional approach or suggest a different test. See 118 S. Ct. at 2149 ("We . . . apply[ ] the three factors that traditionally have informed our regulatory takings analysis."). Applying the same analysis, we reach a different result here.
 
 
 25
 Midwest stakes its claim on the first factor in the traditional analysis, "substantial economic impact." Although Midwest asserts that it satisfies all three conditions, it only really argues that the first applies. Arguments not developed in any meaningful way are waived. See Bratton v. Roadway Package Sys., Inc., 77 F.3d 168, 173 n.1 (7th Cir. 1996). We do not address here whether a failure to make a showing under all three factors would doom a regulatory takings claim, but since Midwest fails to carry its burden under any of them, including the one it actually argues, its challenge must certainly fail.
 
 
 26
 The Supreme Court uses a two-step analysis of "substantial economic impact" in retroactive liability cases. The first is whether there is a "considerable financial burden." Eastern Enterprises, 118 S. Ct. at 2149. It is not evident that Midwest has cleared this bar. While the roughly $1.8 million in challenged liability is a lot of money, for some firms that sum would not involve a considerable financial burden. The loss at issue must be compared to something in order to assess its impact--the net worth of the company or its total payments under the plan might be good places to start. Midwest, however, has not done this.
 
 
 27
 The second step in assessing whether there is "substantial impact" is to examine whether the liability imposed is out of proportion "to [the employer's] experience with the plan." Eastern Enterprises, 118 S. Ct. at 2149 (quoting Connolly, 475 U.S. at 226; Concrete Pipe, 508 U.S. at 645). Here, Midwest's reliance on Eastern Enterprises is misplaced. In that successful Takings Clause challenge to retroactive liability under the 1992 Coal Act, the employer ceased its coal mining operations in 1965 and "[its] obligations under the Act depend[ed] solely on its roster of employees some 30 to 50 years before the statute's enactment, without any regard to responsibilities that Eastern had accepted under any benefit plan the company itself adopted." Eastern Enterprises, 118 S. Ct at 2150. In contrast, Midwest, like the employers who unsuccessfully challenged the MPPAA in Concrete Pipe and Connolly, remained in business throughout the entire period in question, "voluntarily negotiated and maintained a pension plan which was determined to be within the strictures of ERISA," id. at 2149 (internal citations omitted), and its obligations depend on its employment roster both before and after the enactment of the challenged provision.
 
 
 28
 The Supreme Court has stated that participation in a defined ERISA benefit plan in Connolly and Concrete Pipe made the employers' liability proportionate to their experience with the plans because, in virtue of that participation, "the statutory liability was linked to the employers' conduct." Eastern Enterprises, 118 S. Ct. at 2150. In some extraordinary case there may be an exception to this rule, but Midwest has not shown that this is such a case. The fact that Midwest's pre-1979 retroactive liability is about two and a half times its post-1980 prospective liability does not suggest substantial disproportionality. That retroactive liability was incurred over a period about one and a half times as long as the period in which it acquired its prospective liability. The relevance of the fact that Midwest's retrospective liability is a higher proportion of its contributions to the Central States fund than its prospective contributions is unclear. Midwest cites no authority suggesting that such a ratio indicates "substantial disproportionality." Midwest's challenge thus fails under the traditional test.
 
 
 29
 Finally, Midwest again invokes Justice O'Connor's Connolly and Concrete Pipe concurrences, here to argue for an unconstitutional taking rather than a substantive due process violation. Midwest in effect asks us to adopt these concurrences as the law of regulatory takings in this circuit. We decline, in part to avoid complicating a difficult area of law and in part because it would make no difference if we did. Imposing retroactive withdrawal liability upon Midwest would not violate Justice O'Connor's concerns. First, there existed the "basis in the employer's conduct that would make it rational to treat the employees' expectations of benefits under the plan as the employer's responsibility," Concrete Pipe, 508 U.S. at 647 (O'Connor, J., concurring) (quoting Connolly, 475 U.S. at 229) (same)). The district court found that Midwest exercised enough control or influence over the course of events by provoking the strike and lawfully replacing unionized employees, precipitating the process which led to Midwest's involuntary withdrawal from the Central States pension plan. Reviewed as a factual causal claim or an application of law to fact, this is not clearly erroneous, see Jos. Schlitz Brewing Co., 3 F.3d at 999 (standard of review); even reviewed de novo as a legal claim, "given the heavy burden of showing [a statute] to be unconstitutional," the district court's finding is correct. Turner Elkhorn Mining Co., 428 U.S. at 44.
 
 
 30
 Second, the occurrence of the unfunded vested liability was not "a result of events over which an employer has no control," Connolly, 475 U.S. at 234 (O'Connor, J., concurring). The district court, following the arbitrator, found that Midwest had some control over benefit levels, contribution rates, or other factors that produced unfunded vested benefits liability. Since Midwest agreed to the promised pension benefit levels, ratified the decisions of the Central States trustees, and was represented on the Central States board through the employers' association, this finding is not clearly erroneous. Midwest cannot succeed even under Justice O'Connor's concurrence.
 
 
 31
 Central States, for its part, has two quibbles about the damage award. The first concerns the interest rate Midwest should pay on its contributions. Under the statute, Midwest should be charged the rate "provided under the plan." 29 U.S.C. sec. 1132(g)(2). The plan was amended in 1997 to increase the interest rate by two points. The district court found that, because Midwest withdrew from the plan in 1994, it should not have to pay the higher rate. This is perfectly reasonable. Central States objects that in the various collective bargaining agreements Midwest had prospectively ratified "all actions . . . to be taken by the [Central States] Trustees within the scope of their authority," but does not explain how the trustees were authorized to act for Midwest in any way after its withdrawal from the plan.
 
 
 32
 The second quibble concerns an offset or reduction in the judgment for Central States. The district court ordered Central States to release, in accordance with its agreement with Midwest, certain liens it held on real estate owned by Midwest that secured the outstanding balance of the contested withdrawal liability. Central States refused to comply, and the district court held that Midwest should accordingly be credited about a month's interest on the amount of the liens that should have been released ($547,000 at the prime rate). The district court also awarded Midwest attorneys fees of $12,093.26 and costs connected with litigation over the release of the liens.
 
 
 33
 These adjustments are entirely justified, and it is hard to see why Central States appeals them. Central States complains that Midwest had not shown that it was damaged by the refusal to release the liens, but the real point is that Central States was not damaged by the award of the month's interest, since it retained the valuable liens for that period. Moreover, Central States escaped the potentially serious sanctions it might have faced for refusing to obey a court order to release the liens. To have to pay a month's interest on their value and to have to reimburse Midwest for its attorneys fees and costs in connection with that refusal is getting off easy.
 
 
 34
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Judge Cummings participated in the consideration of this case, but he died before the decision was rendered.
 
 
 [2]
 The MPPAA is also retroactive in another way not relevant here. See 29 U.S.C. sec. 1461(e)(2)(A) (making the effective date of the statute 5 months prior to its enactment in order to discourage strategic withdrawals during congressional debate during that period). The constitutionality of this provision was upheld against a substantive due process challenge in Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717 (1984).
 
 
 [3]
 The substantive law of the case was affirmed on review in Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co., 513 U.S. 414 (1995), but the Supreme Court did not reach the issue of the statutory standard of review.