**MUELLER SPORTS MEDICINE, INC., Plaintiff,**

v.

**BEVERIDGE MARKETING, LLC d/b/a BMC Custom Eye Black, Defendant.**

No. 04–C–648–C.

United States District Court, W.D. Wisconsin.

May 12, 2005.

See also 2004 WL 2536450.

Allen A. Arntsen, Madison, WI, for Plaintiff.

Michael R. Fitzpatrick, Janesville, WI, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

In this civil action for declaratory, injunctive and monetary relief, plaintiff Mueller Sports Medicine, Inc. contends that defendant Beveridge Marketing, LLC infringed claims 1, 5 and 7 of plaintiff's U.S. Patent No. 4,719,909 (the '909 patent), which relates to an under-eye light absorbing device, by making and selling Custom Eye Black. Plaintiffs bring their claim of infringement under 35 U.S.C. § 271. Jurisdiction is present. 28 U.S.C. §§ 1331 and 1338.

Now before the court are the parties' cross motions for summary judgment. The central disputes are whether defendant's product is "replaceable," whether it includes a "pliable sheet material," whether it has a pressure sensitive adhesive and if so whether the bond formed by the pressure sensitive adhesive is strong enough to withstand perspiration and exercise. I conclude that defendant's product has a pressure sensitive adhesive. However, I will grant defendant's motion and

deny plaintiff's because the product is not replaceable, does not contain a pliable sheet material and there is no evidence that the pressure sensitive adhesive can withstand perspiration and exercise. Although plaintiff has raised a number of interesting and creative arguments, this case presents a square-peg, round-hole situation in which no argument could lead to a finding of infringement.

From the parties' proposed findings of fact, I find that the following are material and undisputed.

## UNDISPUTED FACTS

Plaintiff Mueller Sports Medicine, Inc. is a Wisconsin corporation with its principal place of business in Prairie Du Sac, Wisconsin. Plaintiff is the assignee of U.S. Patent No. 4,719,909, which is directed to an under-eye light absorbing device. Defendant Beveridge Marketing, LLC is a Maryland limited liability company with its principal place of business in Kensington, Maryland. Defendant sells a product called BMC Custom Eye Black, which is a customizable temporary tattoo designed to be placed under the eye. Plaintiff brought this infringement action against defendant on September 3, 2004, alleging infringement of independent claim 1 and dependent claims 5 and 7 of the '909 patent.

### A. The '909 Patent

Claim 1 of the '909 patent reads:

1. An under-eye light absorbing device, comprising:
a replaceable pliable sheet material patch having a first face for generally comfortable application to the skin area on the zygomatic arch along the lower side of the orbit of a user, said patch being of sufficient extent to substantially cover the skin area on the zygomatic arch when applied to said skin area; pressure sensitive adhesive means on said first face for strippable adhesive retention of the patch on said skin area, said adhesive means removable holding said patch on said skin area, said adhesive means being resistant to perspiration to retain said patch on said skin area during exercise; and
a light absorbing surface on a second face of the patch for absorbing incident light rays directed toward said skin area; said light absorbing surface being dark in color to reduce glare by substantially preventing light from reflecting from said skin area of the zygomatic arch toward the eyes of the wearer, said light absorbing surface being resistant to running caused by perspiration.

During prosecution of the '909 patent, the patent applicants amended claim one, arguing that the amended claim was distinguishable from prior art because the "invention provides an adhesively applied light absorbing patch" held to the skin using an adhesive that is "strippable." The applicants indicated that the strippable adhesive would allow the patch to be removed more easily than the black grease paint worn by football players.

Claims 5 and 7 of the '909 patent depend on claim 1. They read as follows:

5. A device according to claim 1, wherein said patch is generally kidney shaped in outline and of a length and width for generally conforming to the shape of the zygomatic arch skin area to which applied, with a concavely arched edge on the patch for disposition adjacent to the eye socket formation along the orbit.

. . . . .

7. A device according to claim 1, wherein said light absorbing surface is black.

The patent specification provides in part that
As to the light absorbing coating 12, while it may be a coloring material or dye which permeates the body layer 11,

the light absorbing surface 12 may comprise a non-reflective, such as black, hypo-allergenic coating uniformly applied over the surface of the body sheet 11.

In addition, the specification states that

To meet average conditions, the size and shape of the patches [ ] may be standardized at about 1½ inch in length by about 3/4 inch in width.

### B. *Custom Eye Black*

Custom Eye Black consists of a layer of adhesive on a layer of ink; there is no sheet material between the adhesive and the ink. The two layers are sold on a paper backing that is removed during application. Even when the paper backing is removed, the product is a solid material. To apply the product properly, it should be moistened with water and pressed to the skin for at least 10 seconds. After this, the paper backing should be pulled off and the product allowed to dry. These application instructions are printed on the product's paper backing.

The consumer instructions also state that the product is designed to withstand heavy perspiration and it describes how to adjust the products "stickiness level" depending on whether the user is sweating heavily or lightly. The product did not slide or migrate on the faces of college football players who wore the product during a game or on the faces of the members of a college track team during a 45–minute practice. Custom Eye Blacks are removable and their product insert includes instructions for removal.

A pressure sensitive adhesive is one that (1) in dry form, exhibits tack at room temperature; (2) requires no activation by water, solvent, heat or other means to create adhesion or tack; and (3) can be adhered to surfaces upon contact without more than finger or hand pressure. Its primary mode of bonding is not chemical or mechanical but through a polar attraction to a substrate. Without activation by water, solvent, heat or other means, Custom Eye Blacks exhibit a low to medium level of tack and adhere to stainless steel surfaces with only finger pressure.

Defendant's product insert states that Custom Eye Blacks reduce glare. In July 2003, the scientific journal *Archives of Opthomology* published a report about a study conducted at Yale University showing that although black under-eye grease reduces reflected light, anti-glare decals do not. Defendant's product was not tested in this study.

Defendant makes and sells its product in a variety of shapes, sizes and colors. Approximately 60–70% of the Custom Eye Blacks defendant sells are kidney-shaped. In addition, 60–70% the temporary tattoos defendant sells are either solid black or have a black background with a team logo. (There is no indication what percent of defendant's product are *both* black and kidney-shaped.) Some but not all of the Eye Blacks defendant sells are approximately 1 ½ inches in length and 3/4 inch in width. This size is large enough to cover a user's zygomatic arch.

### C. *Preliminary Injunction Hearing*

Shortly after filing its complaint, plaintiff moved for a preliminary injunction. A few hours before the hearing on the motion, defendant's president, Peter Beveridge, applied three Custom Eye Blacks to his forearm. At the hearing, he demonstrated that he was unable to peel the Eye Blacks off his arm but that they would come off in small pieces when rubbed vigorously. Plaintiff's attorney provided a slightly different demonstration. He moistened an Eye Black with a wet towel, pressed it to the skin under his eye for ten seconds and then removed its backing. After removing the backing, he peeled the product off and then placed it back on his face. Although the product stayed on his

face, it wrinkled and was not attached in some spots.

## OPINION

■ Plaintiff contends that defendant's Custom Eye Blacks that are dark in color and kidney-shaped infringe U.S. Patent No. 4,719,909. (It is undisputed that approximately 60–70% of the temporary tattoos defendant sold were dark in color and that 60–70% were kidney-shaped. Although there is no indication how much overlap there is in these figures, at least some of the Custom Eye Blacks defendant sold must have been both dark in color and kidney-shaped.) Infringement analysis is a two-step process. First, courts construe the claims at issue and second, compare the properly construed claims to the accused device. *Cybor Corp. v. FAS Technologies, Inc.,* 138 F.3d 1448, 1454 (Fed. Cir.1998) (en banc); *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996); *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir. 1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). A device infringes a patent claim if it contains every limitation set forth in that claim, either literally or by equivalence. *Johnson Worldwide Assocs. v. Zebco Corp.,* 175 F.3d 985, 988 (Fed.Cir.1999). "A patent is infringed if any claim is infringed." *Pall Corp. v. Micron Separations, Inc.,* 66 F.3d 1211, 1220 (Fed.Cir. 1995). Claim construction is a legal determination to be made by the court while infringement is a question of fact. *Vitronics,* 90 F.3d at 1582; *Insituform Techs., Inc. v. Cat Contracting, Inc.,* 161 F.3d 688, 692 (Fed.Cir.1998).

### A. *Rules Governing Infringement Analysis*

#### 1. *Claim construction*

■ "[I]n interpreting an asserted claim, [a] court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics,* 90 F.3d at 1582. Construction of the disputed terms begins with the claim language, which serves to delineate the virtual metes and bounds of the invention, letting competitors know what they can and cannot do in the way of making and selling similar products. *Bell Communications Research, Inc. v. Vitalink Communications Corp.,* 55 F.3d 615, 619 (Fed.Cir.1995) (citing *Yale Lock Manufacturing Co. v. Greenleaf,* 117 U.S. 554, 559, 6 S.Ct. 846, 29 L.Ed. 952 (1886)). Thus, claim construction must adhere carefully to the precise language of the claims that the patent officer has allowed. *Autogiro Co. of America v. United States,* 181 Ct.Cl. 55, 384 F.2d 391, 396 (1967) ("Courts can neither broaden nor narrow the claims to give the patentee something different than what he set forth [in the claim].").

■ In construing the language of the claims, "[t]here is a 'heavy presumption' that the terms used in claims 'mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art.'" *SuperGuide Corp. v. DirecTV Enterprises, Inc.,* 358 F.3d 870, 874–75 (Fed.Cir.2004) (quoting *Texas Digital Systems, Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1202 (Fed. Cir.2002)). Dictionaries, encyclopedias and treatises may be used in determining the ordinary and customary meaning of claim term language. *Home Diagnostics, Inc. v. Lifescan, Inc.,* 381 F.3d 1352, 1356 (Fed.Cir.2004). "[U]nless compelled to do otherwise, a court will give a claim term the full range of its ordinary meaning." *Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1342 (Fed.Cir.2001).

■ "If the disputed claim term 'is a term with no previous meaning to those of ordinary skill in the prior art, its meaning,

then, must be found elsewhere in the patent.'" *Novartis Pharmaceuticals Corp. v. Abbott Laboratories,* 375 F.3d 1328, 1334 (Fed.Cir.2004) (quoting *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.,* 106 F.3d 1563, 1568 (Fed.Cir.1997)). In most instances, the specification "is the single best guide to the meaning of a disputed term." *Vitronics,* 90 F.3d at 1582. Although the patent specification may not be used to rewrite the claim language, *SuperGuide,* 358 F.3d at 875, the specification may be used to interpret what the patent holder meant by a word or phrase in the claim, *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1433 (Fed. Cir.1988).

█ After considering the claim language and the specification, a court may consider the final piece of intrinsic evidence: the patent's prosecution history. *Vitronics,* 90 F.3d at 1582. "[S]tatements made during the prosecution of a patent may affect the scope of the invention." *Rexnord,* 274 F.3d at 1343. This is especially true if a particular interpretation of the claim was considered and specifically disclaimed during the prosecution of the patent. *Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 30, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997); *Vitronics,* 90 F.3d at 1582–83. Generally, analysis of the intrinsic evidence will eliminate any ambiguity in the claim terms, rendering unnecessary any reference to extrinsic evidence. *Vitronics,* 90 F.3d at 1583.

### 2. Infringement

█ Infringement analysis requires a comparison of the properly construed claims with the allegedly infringing device or method to determine "whether all of the claim limitations are present, either literally or by a substantial equivalent, in the accused device." *Johnson Worldwide Associates, Inc. v. Zebco Corp.,* 175 F.3d 985,

988 (Fed.Cir.1999). "Literal infringement of a claim exists when each of the claim limitations 'reads on,' or in other words is found in, the accused device." *Allen Engineering Corp. v. Bartell Industries, Inc.,* 299 F.3d 1336, 1345 (Fed.Cir.2002). Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner–Jenkinson Co. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 21, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

█ Although plaintiff recited the general standard that infringement may be proved by equivalence, it did not explain how defendant's product infringed the '909 patent under this doctrine. Accordingly, I will analyze defendant's product for literal infringement only and construe plaintiff's failure to develop an equivalence argument as waiver. *Central States, Southeast & Southwest Areas Pension Fund v. Midwest Motor Express, Inc.,* 181 F.3d 799, 808 (7th Cir.1999) ("Arguments not developed in any meaningful way are waived."); *see also Lemelson v. United States,* 752 F.2d 1538, 1547 (Fed.Cir.1985) (plaintiff's burden to prove infringement "extends to infringement under the doctrine of equivalents as well as literal infringement"). Although infringement is a question of fact, *IMS Technology, Inc. v. Haas Automation, Inc.,* 206 F.3d 1422, 1429 (Fed.Cir. 2000), summary judgment is appropriate where there are no material facts in dispute. *Johnson Worldwide,* 175 F.3d at 988.

### B. Infringement by Custom Eye Blacks

### 1. Effect of preliminary injunction holding

█ In moving for summary judgment, defendant contends that the statements I

made at the preliminary injunction hearing regarding my understanding of what the patent required were conclusive and final claim construction. It is not clear why defendant believes this to be the case; I did not make any statement to this effect at the hearing and as plaintiff has noted in its briefs, denying a motion for preliminary injunction is not a conclusive determination about the merits of a suit. *Bordelon v. Chicago School Reform Bd. of Trustees,* 233 F.3d 524, 528 n. 4 (7th Cir.2000) ("[A] court's findings and conclusions at the preliminary injunction stage are by nature preliminary. They are typically based on an incomplete record, using a different standard (likelihood of success on the merits), and therefore are not binding at summary judgment."); *MacDonald v. Chicago Park Dist.,* 132 F.3d 355, 358 (7th Cir. 1997) (decision to grant or deny preliminary injunction is not a decision on merits of suit). My assessment of the '909 patent's claim limitations at the preliminary injunction hearing was, as the name suggests, preliminary. I will now undertake a more thorough analysis of the patent limitations, although without the assistance of any argument from defendant.

### 2. *"Replaceable"*

■ Claim 1 of the '909 patent provides for an under-eye light absorbing device comprising a *"replaceable* pliable sheet material patch." The parties agree that "replaceable" in this context means repositionable but debate whether there is an implied time limitation. (At the preliminary injunction hearing, I rejected plaintiff's argument that the replaceable limitation is satisfied simply because a user can remove and dispose of defendant's product and then put on a new one. Such an interpretation would render the term meaningless; anything of a generic quality can be "replaced" with a second item. Plaintiff does not revive this argument at summary judgment.) Defendant pre-

sumes that there is no specific time limitation and relies on its president's demonstration at the preliminary injunction hearing. Plaintiff also relies on its demonstration at the preliminary injunction hearing but argues that claim 1 should be construed to require only that the product be repositionable during initial application.

■ According to plaintiff, initial application is the only time an athlete would reposition an eye black; thus, this limitation is implied as a matter of logic. In support of this markedly narrow limitation, plaintiff cites the affidavits of two athletic trainers, whom plaintiff characterizes as experts. In their affidavits, the trainers state that the only time they are aware of athletes repositioning eye blacks is during initial application. Plaintiff's argument is unavailing for a number of reasons. First, it reads in a narrow limitation not from the claim language, patent specification or prosecution history but from extrinsic evidence. Extrinsic evidence is an interpretive resource of last resort. *Vitronics,* 90 F.3d at 1583. It may not be used to impose limitations that are in no way found in the intrinsic record. *Dow Chemical Co. v. Sumitomo Chemical Co., Ltd.,* 257 F.3d 1364, 1373 (Fed.Cir.2001) ("extrinsic evidence may be used only to assist in the proper understanding of the disputed limitation; it may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even implicitly, in the specification or file history.")

Second, these two trainers do not qualify as experts or persons skilled in the act of eye black repositioning. Defendant's product is a mass market consumer good sold to athletes at all levels of competition; when a consumer might reposition the product is not a matter of scientific, technical or otherwise specialized knowledge. Fed.R.Evid. 702. Even more problematic than simply not qualifying as "experts" of

eye black repositioning, neither trainer explained why he would have known whether an athlete had repositioned an eye black at some time after initial application. Without such a showing, very little can be drawn from the fact that the trainers were not aware of any post-application repositioning.

Nothing in the claim language, specification or portions of the prosecution history suggests an implied limitation that the patch need be replaceable only during initial application. To the contrary, the prefix "re" indicates that the patch must be placed somewhere before it can be "replaced." *Merriam Webster's Collegiate Dictionary* 971 (10th ed.1997) (defining "re" as "again [or] anew"). Ordinarily, "placed" means put in a particular position or set. *Id.* at 888. Thus, the claim language indicates that the product must be moveable at some point after it has been set in a particular position. Further, the claim specification anticipates that the patches are to be used in connection with "athletic activity such as football, baseball, basketball, tennis, golf and the like." '909 Pat., col. 3, lns. 17–19. Without any indication to the contrary, a natural reading of this passage would suggest that the qualities attributed to the product would endure at least as long as it would ordinarily take an athlete to participate in one of these listed sports.

As for plaintiff's suggestion that initial application is the only time that an athlete would reposition an eye black, there are any number of reasons to think that a person would be equally if not more likely to reposition an eye patch at some later point. An athlete might apply an eye black patch indoor under artificial light and not notice that the patch is not in the best place to block reflection until going outside in full sunlight. Further, a person might readjust the product's position if the angle at which light is hitting his face changes; this might occur as the sun changes position over time or when teams trade sides of the field or court. Finally, skin irritations might prompt an athlete to readjust the position of an eye black patch during the course of an athletic event. Absent any indication in the intrinsic record suggesting a more limited time frame, I conclude that the claim requires that the product be repositionable for the duration of an average game of football, baseball, basketball, tennis or golf.

 In this case, the undisputed facts reveal that defendant's product can be moved for a few minutes before the product dries. But it is also undisputed that proper application includes allowing the product to dry; Custom Eye Blacks are not "placed" anywhere until they have dried. Thus, plaintiff's evidence shows only that defendant's product can be moved during initial placement, not that it can be "*re* placed."

Furthermore, the only evidence as to the mobility of defendant's product after that limited window of time is the demonstration that defendant's president gave at the preliminary pretrial conference. As noted above, defendant's president applied three Custom Eye Blacks to his forearm a few hours before the hearing. At the hearing, he was unable to peel the Eye Blacks off of his arm. Although he was able to remove them by rubbing his arm vigorously, they began to shred and were no longer susceptible to being replaced on his skin. (Plaintiff challenges defendant's demonstration as showing that its product is not "easily removable" when it is in the presence of arm hair and there is a lack of perspiration. However, plaintiff does not argue that defendant's product would be repositionable for more than a few minutes even if it were applied on relatively hairless skin and subject to prolonged periods

of perspiration. Thus, this argument is waived. *Central States,* 181 F.3d at 808.)

From the evidence presented, the only reasonable conclusion to be drawn is that defendant's product can be moved only for a few minutes after it has been wetted and pressed to the skin and before it has dried. Because claim 1 of the '909 patent requires that a patch be *re* positionable for the normal duration of its use, no inference of infringement of this claim may be drawn. Although this conclusion alone warrants granting summary judgment in defendant's favor, there are two other glaring reasons for this result: Custom Eye Blacks do not contain a "pliable sheet material" and there is no evidence suggesting that the pressure sensitive adhesive creates a bond strong enough to withstand perspiration and exercise. I turn next to addressing each of these grounds for denying plaintiff's motion and granting defendant's.

### 3. *"Pliable sheet material"*

■ At the preliminary injunction hearing, I found that claim 1 of the '909 patent requires three things: a core made of a pliable sheet material, a layer of adhesive and a light absorbing coating. As I noted at the hearing, and as is undisputed here, defendant's product has only a layer of ink and a layer of adhesive and no pliable sheet material separating the two. (I will construe defendant's assumption that this conclusion was final as an argument that this construction is correct.) Plaintiff contends that the patent does not necessarily require three layers; it argues that the limitation may be satisfied by an ink layer and an adhesive layer that combine to form a pliable sheet material.

Plaintiff cites the following passage from the claim specification as teaching both a two- and three-layered structure:

As to the light absorbing coating 12, while *it may be a coloring material or dye which permeates the body layer,* the light absorbing surface may comprise a non-reflective, such as black, hypo-allergenic coating uniformly applied over the surface of the body sheet.

'909 Pat., col. 2, lns. 37–41 (emphasis added). According to plaintiff, this passage confirms that the '909 patent encompasses two-layered devices wherein the light absorbing coating becomes "one and the same" with the body layer. To the extent that plaintiff is suggesting that this portion of the specification indicates that the color material or dye might qualify as the body layer itself, such a reading would rest on an unsustainable interpretation of the word "permeates." Instead, I understand plaintiff to posit the far more reasonable construction that the patch might consist of two layers wherein one is the adhesive layer and the other is a body material permeated with a some sort of dye. Although I would tend to agree that this portion of the patent specification reveals that the body layer and the coloring material do not need to be physically distinct, plaintiff makes a sleight-of-hand-like suggestion that because the patch might be characterized as a "two-layered" that any two layers will do. If anything, this passage indicates that there must be some sort of body material in addition to the adhesive and the dye or other coloring material.

Other portions of the specification provide further confirmation that "pliable sheet material" means something other than the dye and adhesive:

For the body sheet layer [ ], any economically feasible, self-sustaining, pliable sheet material may be used such as a medical grade air permeable tissue. This may be a felted fibrous material such as semi-bleached craft, porous thin plastic sheet, plastic mixed or impregnated paper tissue, or any other thin

sheet material such as may be used for medical adhesive bandages, and which is susceptible to mass production die cutting or stamping of the patches.

'909 Pat., col. 2, lns. 28–36. This specification teaches that the pliable sheet material must be akin to a medical grade air permeable tissue, a semi-bleached craft, a porous thin plastic sheet, a plastic mixed or impregnated paper tissue, or any other thin sheet material that may be used for medical adhesive bandages. Additionally, it shows that the sheet material must be sufficiently "pliable" as to be "susceptible to mass production die cutting or stamping of the patches." *See also Merriam Webster's Collegiate Dictionary* 894 (10th ed.1997) (defining "pliable" as "supple enough to bend freely or repeatedly without breaking").

In light of the above specifications, I conclude that "pliable sheet material" means a thin, flat bendable material, similar to a medical grade air permeable tissue, porous thin plastic sheet or a plastic mixed or impregnated paper tissue, having one side either coated or permeated with a light absorbing material and having a layer of pressure sensitive adhesive on its opposing side.

▋ Defendant's product consists only of a layer of adhesive on a layer of ink. Because the '909 patent requires a pliable sheet material in addition to a light absorbing material and a pressure sensitive adhesive, defendant's product does not infringe. Even if the claim language and specification would allow for a pliable sheet material consisting of nothing more than the combined layers of coloring and adhesive, plaintiff has not argued, proposed facts or submitted evidence to show that these two layers in defendant's product bond to form a sheet that is pliable. Instead, plaintiff substituted the word "solid" for "pliable" in its submissions without making an argument that pliable should be

defined to mean solid and nothing more. This argument would not have been well taken if plaintiff had raised it; as I have already explained, both the patent specification and the ordinary meaning of the word "pliable" connote a level of flexibility and resilience not found in every "solid." None of plaintiff's proposed findings of fact suggest that defendant's product can be removed from its paper lining and bent repeatedly without breaking or becoming deformed or that it is susceptible to die cutting or stamping.

### 4. *"Pressure sensitive adhesive"*

Claim 1 of the '909 patent provides for an under-eye light absorbing patch with "pressure sensitive means adhesive means on said first face for strippable adhesive retention of the patch on said skin area ... [and] said adhesive means being resistant to perspiration to retain said patch on said skin area during exercise." '909 Pat. col. 3, lns. 59–64. It is undisputed that a pressure sensitive adhesive is one that (1) in dry form, exhibits tack at room temperature; (2) requires no activation by water, solvent, heat or other means to create adhesion or tack; and (3) can be adhered to surfaces upon contact without more than finger or hand pressure.

▋ Without activation by water, solvent, heat or other means, Custom Eye Blacks exhibit a low to medium level of tack and adhere to stainless steel surfaces with only finger pressure. Although this shows that defendant's product has some kind of pressure sensitive means, the '909 patent claims a pressure sensitive adhesive means sufficiently resistant to perspiration to keep the patch on a user's under eye skin during exercise. Plaintiff has proposed as fact that defendant's product stays on a user's zygomatic arch without sliding during exercise. Plt.'s PFOF, dkt. # 50, at 9, ¶ 65. In support of this propos-

al, plaintiff cites two affidavits of athletic trainers, both of whom averred that defendant's product did not slide or migrate once applied to an athletes under-eye skin but neither of whom indicated that the athletes did not use water in applying the product as directed by the application instructions. Gibson Aff., dkt. # 52, at 4, ¶ 12; Clements Aff., dkt. # 53, at 5, ¶ 14. In fact, one of the trainers confirmed expressly that his athletes had followed the instructions in applying defendant's product. Gibson Aff., dkt. # 52, at 4, ¶ 12. Plaintiff also highlights the indication on defendant's product label that the eye blacks resists even heavy perspiration, but no reasonable inference can be drawn that this advertisement refers to situations in which the product is not applied according to the directions provided. Plaintiff readily concedes that adhesive bonding activated by water is not pressure sensitive adhesion.

It is not enough that defendant's product have some sort of pressure sensitive adhesive means and some other non-pressure sensitive adhesive means that allows for retention during perspiration and exercise; the '909 patent claims a pressure sensitive adhesive means resistant to perspiration for retention during exercise. Because plaintiff has not submitted evidence to show that the pressure sensitive adhesive on defendant's product would resist perspiration during exercise, defendant is entitled to summary judgment as to claim 1. *Nutrinova Nutrition Specialties and Food Ingredients GmbH v. International Trade Commission*, 224 F.3d 1356, 1359 (Fed.Cir.2000) (as party alleging infringement, plaintiff bears the burden of proof); *Novartis Corp. v. Ben Venue Laboratories, Inc.*, 271 F.3d 1043, 1050–51 (Fed.Cir.2001) ("[A] patentee who fails to provide probative evidence of infringement runs the risk of being peremptorily nonsuited.").

5. *Claims 5 and 7*

In addition to claiming infringement of independent claim 1 of the '909 patent, plaintiff claimed that defendant's product infringed claims 5 and 7 which are both dependent on claim 1. A dependent claim cannot be infringed unless the independent clause on which it depends has been infringed. *Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1300 (Fed.Cir.2002). Thus, defendant is entitled to summary judgment as to claims 5 and 7 in addition to claim 1.

## ORDER

IT IS ORDERED that plaintiff Mueller Sports Medicine, Inc.'s motion for summary judgment is DENIED and defendant Beveridge Marketing, LLC's motion for summary judgment is GRANTED. The clerk of court is directed to enter judgment in favor of defendant and close this case.